884 F.2d 1392
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Nathaniel MATHES, Defendant-appellant,
v.
UNITED STATES of America, Plaintiff-appellee.
 No. 88-4116.
 United States Court of Appeals, Sixth Circuit.
 Sept. 18, 1989.
 
 Before KENNEDY and KRUPANSKY, Circuit Judges, and WENDELL A. MILES, Senior District Judge.*
 PER CURIAM.
 
 
 1
 Nathanial Mathes (Mathes) has timely perfected an appeal from his conviction subsequent to a jury trial on two criminal counts pertaining to the distribution of cocaine in violation of controlled substance statutes: namely, one count of possession of cocaine with the intent to distribute the substance in violation of 21 U.S.C. Sec. 841(a)(1), and one count of aiding and abetting another individual in the distribution of cocaine in violation of 21 U.S.C. Sec. 841(a)(1) and 18 U.S.C. Sec. 2.
 
 
 2
 The record developed during the trial disclosed the following underlying facts. The arrest of Mathes came about as a result of an undercover operation initiated by Special Narcotics Agents of the Federal Bureau of Investigation (FBI). On March 19, 1988, the FBI arrested an individual named Dennis Brown (Brown) and charged him with possession of two kilograms of cocaine. After Brown had consulted with his attorney subsequent to his arrest, he agreed to cooperate with special agents of the FBI in their undercover investigation of cocaine distribution in Northern Ohio. Special Agents Baber and McCorkle questioned Brown about the source of his supply of cocaine. Brown advised the special agents that Mathes, the criminal defendant and appellant in the instant appeal, had sold him the cocaine. During his interrogation Brown indicated that he expected Mathes would be contacting him in the foreseeable future to collect the money Brown owed him for the two kilograms of cocaine confiscated from him at the time of his arrest.
 
 
 3
 Acting upon this information, the FBI agents permitted Brown to telephone Mathes on that same date, March 19, 1988, and to negotiate the purchase of approximately five additional kilograms of cocaine from him later that same afternoon. The telephone calls were monitored and tape recorded by the special agents.
 
 
 4
 The FBI agents placed the agreed upon rendezvous for the purchase of cocaine from Mathes under surveillance and at approximately 4:30 p.m. Mathes arrived at that location, driving an older model blue Chevrolet. As they had previously agreed, Mathes proceeded to a deserted area behind the shopping complex, where Brown approached his vehicle.
 
 
 5
 Agent McCorkle, who was located approximately fifty yards from the rendezvous point, observed Brown and Mathes engage in a short conversation, after which Mathes handed an object to Brown. Mathes thereupon slowly drove his vehicle from the scene, leaving Brown with a large, dark colored plastic garbage bag.
 
 
 6
 Special Agent McCorkle immediately placed Brown into custody and secured the plastic garbage bag and its contents, which consisted of five individual bags containing a white, powdery substance. Laboratory examination later disclosed that each of the five small bags contained one kilogram of cocaine, for an aggregate of five kilograms of cocaine. FBI agents arrested Mathes as he attempted to leave the shopping center parking lot.
 
 
 7
 Mathes and Brown were indicted on April 6, 1988 by a federal grand jury which returned a two count indictment, charging Mathes with possession of cocaine with the intent to distribute, and with aiding and abetting Brown in the possession of cocaine with the intent to distribute.
 
 
 8
 The two defendants were scheduled to be tried jointly on October 3, 1988 before a jury. On August 26, 1988, Brown entered into an agreement to plead guilty to one count of possession of cocaine and to testify against Mathes in the upcoming criminal trial. Unfortunately, on September 3, 1988, Brown was shot to death in his home.
 
 
 9
 Subsequent to trial, the jury returned guilty verdicts against Mathes on both of the charged counts. The district court sentenced Mathes to a term of one hundred fifty-one months of imprisonment, to be followed by a period of supervised release of five years. Mathes timely perfected an appeal from his conviction below.
 
 
 10
 Mathes initially contended that the government's exercise of a preemptory challenge against the only black member of the jury venire violated the teachings of the United States Supreme Court in Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), wherein the Court held that "the State denies a black defendants equal protection of the laws when it puts him on trial before a jury from which members of his race have been purposefully excluded." Batson, 476 U.S. at ----, 106 S.Ct. at 1716. In Batson, the Supreme Court indicated that a criminal defendant could present a prima facie showing of racially predicated exclusion of prospective jury members "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." Batson, 476 U.S. at ----, 106 S.Ct. at 1721 (citing Washington v. Davis, 426 U.S. 229, 239-42, 96 S.Ct. 2040, 2047-49, 48 L.Ed.2d 597 (1976)).
 
 
 11
 "Once the defendant makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation for challenging black jurors." Batson, 476 U.S. at ----, 106 S.Ct. at 1723 (citations omitted); accord United States v. Davis, 809 F.2d 1194, 1201-02 (6th Cir.), cert. denied, 483 U.S. 1007, 107 S.Ct. 3234, 97 L.Ed.2d 740 (1987). In the case at bar, the transcript of the record indicated that after the Assistant United States Attorney had exercised one of the government's allotted preemptory challenges to strike the only black individual on the jury venire, defense counsel interposed an objection to the removal of the prospective juror, invoking the pronouncements of Batson. The government thereupon explained that its reason for requesting the removal of Hutton was not on account of his race, but rather because it was known to the government that he had previously been arrested on a criminal charge arising from a domestic disturbance. Although this charge had ultimately been dismissed, the government argued that the arrest could tend to predispose Hutton against the prosecution in the instant case.
 
 
 12
 In the case at bar, the district court credited the government's explanation for exercising a peremptory challenge because it was apprehensive that Hutton's previous experiences with the criminal justice system could reasonably cause him to be unfairly unsympathetic toward the prosecution. In Batson, the Supreme Court indicated that "[s]ince the trial judge's findings in the context under consideration here largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference." Batson, 476 U.S. at ----, 106 S.Ct. at 1724 n. 21 (citing with approval Anderson v. City of Bessemer City, 470 U.S. 654, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985)); compare Davis, 809 F.2d at 1203. The defendant has failed to present any argument or reason to challenged the district court's decision to assign credibility to the government's neutral explanation for striking the only black jury venire member; consequently, the district court's decision as to this issue must be affirmed.
 
 
 13
 The second allegation of error charged by the appellant relates to the district court's failure to have dismissed four prospective jurors for cause because, based upon voir dire examination, they stated that they would be more likely to credit the testimony of a law enforcement officer than the testimony of an ordinary citizen. Defense counsel urged the removal of these prospective jurors for cause, because they had demonstrated an impermissible bias in favor of law enforcement personnel.
 
 
 14
 The trial court overruled the defense motion to strike the jurors at issue, concluding that an appropriate credibility cautionary instruction would advise the jury that it was not to assign greater or lesser credibility to the testimony of law enforcement officials that to any other witness. Thereafter, defense counsel peremptorily dismissed only three of the prospective jurors in question from the venire and did not peremptorily remove any additional prospective jurors, although he had seven remaining peremptory challenges.
 
 
 15
 On appeal, the defendant has argued that the district court committed reversible error in refusing to dismiss challenged prospective jurors for cause. In its recent decision in Ross v. Oklahoma, --- U.S. ----, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988), the United States Supreme Court rejected a closely analogous argument in a capital sentencing case wherein the criminal defendant charged that the failure of the trial court to have removed a particular juror for cause because of potential bias concerning the imposition of capital punishment mandated reversal of his conviction and sentence. "[A]s there is nothing in the record to show that any juror who sat on the trial was objectionable, we are unable to discover any grounds for reversal." Ross, --- U.S. at ----, 108 S.Ct. at 2276.; accord United States v. Mercer, 853 F.2d 630, 632 (8th Cir.), cert. denied, --- U.S. ----, 109 S.Ct. 566, 102 L.Ed.2d 591 (1988) and --- U.S. ----, 109 S.Ct. 3166, 104 L.Ed.2d 104 (1989). In the instant case, because Mathes had seven peremptory challenges which he did not utilize, and because he has failed to demonstrate that the jury panel which ultimately considered and decided his case was not impartial, any potential error which may have resulted from the district court's failure to have excused the four jury panel members at issue was thus harmless beyond a reasonable doubt.
 
 
 16
 The appellant's third assignment of error relates to the district court's admission of the tape recordings of conversations between Mathes and the FBI informant, Brown. The appellant has argued that the district court's decision was erroneous because the tape recordings of the conversations were not admissible since Brown's consent had been given under duress, because the conversations constituted hearsay, and because the procedure employed by the government to transcribe and introduce the tapes as evidence infringed upon his constitutional right to a public trial.
 
 
 17
 Mathes initially argued that Brown's cooperation had been coerced at the time of his arrest by promises of lenient treatment if he cooperated with the FBI agents. The cases which have examined similar factual patterns to those presented in the instant appeal have uniformly rejected the contention that such circumstances amount to "coercive activity" on the part of the police officials. See, e.g., United States v. Kolodziej, 706 F.2d 590, reh'g denied, 712 F.2d 975 (5th Cir.1983); United States v. Salisbury, 662 F.2d 738 (11th Cir.1981), cert. denied, 457 U.S. 1107, 102 S.Ct. 2907, 73 L.Ed.2d 1316 (1982); United States Osser, 483 F.2d 727 (3rd Cir.), cert. denied, 414 U.S. 1028, 94 S.Ct. 457, 38 L.Ed.2d 321 (1973); Cooper v. United States, 594 F.2d 12 (4th Cir.1979); accord United States v. Horton, 601 F.2d 319 (7th Cir.), cert. denied, 444 U.S. 937, 100 S.Ct. 287, 62 L.Ed.2d 197 (1979). Existing precedent thus forecloses the appellant's argument that the FBI agents' suggestion of possible leniency in later criminal proceedings to Brown served to coerce Brown in consenting to the recording of his conversations with Mathes.
 
 
 18
 The appellant additionally charged that the the comments made by Brown during his conversations with Mathes, recorded on the tapes, constituted hearsay. The prosecution responded to the appellant's charges that the taped conversations constituted hearsay by noting that the Brown's statements were not being offered to prove the truth and accuracy of the statements, but rather to place the sequence of events which had occurred between Mathes and Brown into context with Mathes's admissible statements against interest. The district court agreed and overruled appellant's objection. Existing precedent supports the district court's conclusion that the introduction of the taped conversations for the above stated purpose did not constitute hearsay. See, e.g., United States v. Rollins, 862 F.2d 1282, 1296-97 (7th Cir.1988), cert. denied sub nom. Slaughter v. United States, --- U.S. ----, 109 S.Ct. 2084, 104 L.Ed.2d 648 (1989); United States v. Jordan, 810 F.2d 262, 264 (D.C.Cir.) (citing United States v. Lemonakis,, 485 F.2d 941, 948 (D.C.Cir.1973), cert. denied, 415 U.S. 989, 94 S.Ct. 1586, 39 L.Ed.2d 885 (1974)), cert. denied, 481 U.S. 1032, 107 S.Ct. 1963, 95 L.Ed.2d 535 (1987); see also United States v. Saint Prix,, 672 F.2d 1077, 1083 (2nd Cir.), cert. denied, 456 U.S. 992, 102 S.Ct. 2274, 73 L.Ed.2d 1287 (1982); United States v. Bruner, 657 F.2d 1278, 1284-85 (D.C.Cir.1981). See generally United States v. Hathaway, 798 F.2d 902, 905 (6th Cir.1986).
 
 
 19
 The appellant has raised several interrelated challenges to the procedure employed by the district court in permitting the jury to hear the tape recording. In essence, the government used a system of individual headphones by which all of the jurors, the defendant, as well as counsel for both sides and the trial judge, were simultaneously permitted to hear the taped conversations. An FBI agent instructed the members of the jury in the operation of the individual tape monitoring headphones. Members of the public attending the trial were unable to simultaneously hear the contents of the tape recordings.
 
 
 20
 On appeal, the appellant asserted that the procedure employed by the district court violated the Sixth Amendment's guarantee of a public trial. See, e.g., Gannett Co. v. DePasquale, 443 U.S. 368, 380, 99 S.Ct. 2898, 2905, 61 L.Ed.2d 608 (1979); In re Oliver, 333 U.S. 257, 266-67, 68 S.Ct. 499, 504, 92 L.Ed. 682 (1949); see also Waller v. Georgia, 467 U.S. 39, 46, 104 S.Ct. 2210, 2215, 81 L.Ed.2d 31 (1984). In the instant case, although the public had been precluded from hearing the tape recordings at the precise instant that the jury listened to them, the trial court advised defense counsel that it would arrange to have the tapes played in their entirety for those members of the public interested in listening to them. Defense counsel declined this offer. Accordingly, violation of the Sixth Amendment's guarantee of a public trial, if any occurred, was waived by defense counsel's tactical election to reject the trial court's alternative procedure to permit the public to listen the tapes at issue. See, e.g., Allen v. Morris, 845 F.2d 610, 616 (6th Cir.1988), cert. denied, --- U.S. ----, 109 S.Ct. 799, 102 L.Ed.2d 790 (1989); accord Taylor v. Illinois, 484 U.S. 400, ----, 108 S.Ct. 646, 657, 98 L.Ed.2d 798 (1988).
 
 
 21
 The appellant has also suggested that the district court erred in its procedure for permitting the jury to review printed transcripts of the tape recordings in question. The government FBI agent, who was responsible for the printing of the transcription of the tapes, testified that the printed transcripts were a fair and accurate representation of the contents of the tapes themselves. On appeal, Mathes has charged that this procedure violated this court's teachings in United States v. Robinson, 707 F.2d 872 (6th Cir.1983), which indicated that, generally, a transcript's accuracy should either be stipulated by the parties, or that both the transcribing party and the trial court should examine the transcript to determine its accuracy. Robinson, 707 F.2d at 879. In the instant case, Mathes argued that the trial court committed reversible error since it did not independently review McCorkle's printed transcripts to determine their accuracy.
 
 
 22
 The appellant, however, errs in suggesting that Robinson established a per se rule requiring the trial judge to personally verify the accuracy of a submitted printed transcription in all instances. Indeed, the use of such terms as "reiterate our preference," "the transcriber should verify that he ... has ... accurately transcribed its contents," and "[t]he court should also make an independent determination of accuracy," by the court in its decision, see Robinson, 707 F.2d at 878-79, indicates that the court was establishing general directives for the guidance of the bench and bar, rather than strict instructions of a mandatory nature in all instances. Instead, a reviewing court must examine the specific procedures employed in each particular case to determine whether "the transcripts utilized at trial bear ... [a] semblance of reliability." Robinson, 707 F.2d at 879.
 
 
 23
 In the instant case, the printed transcripts were sufficiently reliable to pass this test. The tapes were transcribed by agent McCorkle, who relied upon the tapes themselves in preparing the printed transcripts, rather than soliciting the opinions of other agents as to their recollection of the tapes' contents as occurred in Robinson. Additionally, the trial court carefully instructed the jury to first listen to the tape recordings themselves and then, only if they had questions or problems, to examine the printed transcripts along with the tapes, during a second review of material, in contrast to Robinson, wherein the jurors were given the printed transcripts only at the time the tapes were played. Finally, unlike Robinson, defense counsel has not suggested in the case at bar that the tapes were inaudible or undecipherable, even though he had personally reviewed the tapes and the government's printed transcripts, both before and during the trial. Accordingly, it would appear that the district court did not abuse its discretion in permitting the jury to examine the submitted printed tape transcripts.
 
 
 24
 Finally, even if it were assumed that the trial court abused its discretion in permitting the jury to have the printed transcriptions of the tape, the error would be harmless because the defendant failed to identify any specific and demonstrable prejudice which inured to his detriment as a result of the trial court's ruling. See, e.g., United States v. Dorn, 561 F.2d 1252, 1257 (7th Cir.1977) (per curiam), overruled in part on other grounds sub nom. United States v. Read, 658 F.2d 1225 (7th Cir.1981); accord United States v. Costa, 691 F.2d 1358, 1363 (11th Cir.1982).
 
 
 25
 The appellant next charged that the district court erred in refusing to instruct the jury on the lesser included offense of mere possession of cocaine, rather than the more serious offense of possession of cocaine with intent to distribute it. "[I]t is now beyond dispute that the defendant is entitled to an instruction on a lesser included offense if the evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater." Keeble v. United States, 412 U.S. 205, 208, 93 S.Ct. 1993, 1995, 36 L.Ed.2d 844 (1973) (citations and footnotes omitted). "Possession of a controlled substance, relative to the crime of possession of such with intent to distribute, is a prototypical 'lesser included offense.' " United States v. Burns, 624 F.2d 95, 104 (10th Cir.), cert. denied sub nom. Reynolds v. United States, 449 U.S. 954, 101 S.Ct. 361, 66 L.Ed.2d 219 (1980).
 
 
 26
 Mathes has argued that he was entitled to have the jury instructed on the lesser included offense of simple possession of cocaine, and that the trial court's failure to have so instructed the jury, after defense counsel had properly argued the issue, is reversible error. Existing case precedent indicates that as a "prerequisite for a lesser included offense instruction ... the evidence at trial must be such that a jury could rationally find the defendant guilty of the lesser offense, yet acquit him of the greater." Schmuck v. United States, 489 U.S. ----, ---- n. 8, 109 S.Ct. 1443, 1450 n. 8, 103 L.Ed.2d 734 (1989) (citing Keeble, 412 U.S. at 208, 93 S.Ct. at 1995). In the instant case, the trial court correctly denied the appellant's request that the jury be charged on the lesser included offense of mere possession because "the evidence [was] such that the jury could not rationally find the defendant guilty of the lesser offense." United States v. Payne, 805 F.2d 1062, 1067 (D.C.Cir.1986).
 
 
 27
 Mathes was charged with possession of cocaine with intent to distribute, and with aiding and assisting Brown in the possession of cocaine with the intent to distribute, based upon the five kilograms of cocaine which Mathes had delivered to Brown in the parking lot. Mindful of the fact that Mathes had delivered the five kilograms of cocaine confiscated from Brown, the argument that Mathes possessed such a substantial quantity of cocaine for his personal use is absurd. Burns, 624 F.2d at 104. Furthermore, even if this court concluded that the district court erred in failing to instruct the jury on the lesser included offense in the case at bar, in light of the weight of the evidence developed at the trial, any such error would be deemed harmless. See, e.g., United States v. Guyon, 717 F.2d 1536, 1544-45 (6th Cir.1983), cert. denied, 465 U.S. 1067, 104 S.Ct. 1419, 79 L.Ed.2d 744 (1984). Accordingly, the district court did not err in rejecting appellant's request to charge the jury on the lesser included offense.
 
 
 28
 This court has considered the defendant's remaining assignments of error and has concluded that they are without merit. Accordingly, the judgments of conviction entered against Mathes are hereby AFFIRMED.
 
 
 
 *
 The Honorable Wendell A. Miles, Senior United States District Judge for the Western District of Michigan, sitting by designation